**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| JASON LEVITT, *et al.*,　　　　　) | |
| 　　　　　　　　　　　　　　　) | |
| 　　　　　Plaintiffs,　　　　　) | |
| 　　　　　　　　　　　　　　　) | |
| v.　　　　　　　　　　　　　　) | Case No. 1:10cv296 (AJT/IDD) |
| 　　　　　　　　　　　　　　　) | |
| JOSHUA KAUFFMAN, *et al.*,　　) | |
| 　　　　　　　　　　　　　　　) | |
| 　　　　　Defendants.　　　　　) | |
| | |

## <u>ANSWER AND COUNTERCLAIM</u>

Defendants Joshua Kauffman ("Kauffman") and Navitus Group, LLC ("Navitus") (collectively "Defendants"), by counsel, hereby answer the Complaint ("Complaint") filed by Plaintiffs Jason Levitt ("Levitt") and Full Spectrum Power LLC ("Full Spectrum") (collectively "Plaintiffs"). Defendants deny each and every allegation, whether express or implied, contained in the First Amended Complaint ("Complaint") that is not specifically admitted herein. Defendants answer and respond to the specific numbered Paragraphs as follows:

### <u>Responses to Numbered Paragraphs</u>

1.　　　Defendants are without sufficient information to admit or deny the allegations contained in Paragraph 1 of the Complaint, and therefore deny same.

2.　　　Defendants admit the allegations contained in Paragraph 2 of the Complaint.

3.　　　Defendants deny the allegations contained in Paragraph 3 of the Complaint, except admit that this Court has subject matter jurisdiction over this action.

4.　　　Defendants deny the allegations contained in Paragraph 4 of the Complaint.

5.　　　Defendants admit the allegations contained in Paragraph 5 of the Complaint.

6.　　　Defendants deny the allegations contained in Paragraph 6 of the Complaint.

7.     Defendants deny the allegations contained in Paragraph 7 of the Complaint.

8.     Defendants are without sufficient information to either confirm or deny the allegations contained in Paragraph 8 of the Complaint, and therefore deny same.

9.     Defendants deny the allegations contained in Paragraph 9 of the Complaint. Defendants specifically deny that Defendants contacted Levitt for technical expertise, because Levitt did not have such expertise.

10.    Defendants deny the allegations contained in Paragraph 10 of the Complaint, except admit that Levitt may have used his access to Kauffman's business to learn about Defendants' work product and operations.

11.    Defendants deny the allegations contained in Paragraph 11 of the Complaint, except admit that Plaintiff Levitt asked if he could install one 4.6Ah battery system on his motorcycle, that Defendants manufactured this battery without Levitt's involvement, and that despite request, Levitt never returned the battery to Defendants.

12.    Defendants deny the allegations contained the Paragraph 12 of the Complaint. Defendants specifically deny that Levitt had anything to do with the manufacturing and testing of the batteries before the parties even met.

13.    Defendants deny the allegations contained in Paragraph 13 of the Complaint, except admit that Levitt acted solely as a non-exclusive distributor for Defendants' products on the East Coast.

14.    Defendants deny the allegations contained in Paragraph 14 of the Complaint.

15.    Defendants deny the allegations contained in Paragraph 15 of the Complaint, except admit that Plaintiff Levitt was merely a non-exclusive distributor of the SPEEDCELL products.  Defendants specifically deny that Levitt had any role in the manufacture of the batteries (e.g. raw materials, labor, operating expenses, insurance).

16.     Defendants deny the allegations contained in Paragraph 16 of the Complaint, except admit that Plaintiff Levitt knew that Defendants were already using the mark "SPEEDCELL" before Plaintiff Levitt served as Defendants' non-exclusive distributor on the East Coast.

17.     Defendants deny the allegations contained in Paragraph 17 of the Complaint, except state that while Plaintiff Levitt referred Defendants to an acquaintance who did graphic artist work on the side, Defendants commissioned the work, incurred the cost of the artwork, and owned all work product related to the SPEEDCELL name long before Levitt began to serve as a non-exclusive distributor on the East Coast.  This graphic design process was not even completed until after Plaintiffs allege to have first used the design in commerce, demonstrating false allegations made by Plaintiffs.

18.     Defendants deny the allegations contained in Paragraph 18 of the Complaint. Defendants specifically deny that Levitt had any authority to commandeer use and depiction of the mark SPEEDCELL that Defendants had already been using in the industry.

19.     Defendants deny the allegations contained in Paragraph 19 of the Complaint, except admit that Plaintiff Levitt was a non-exclusive distributor of Defendants' SPEEDCELL products, and contrary to Plaintiffs' allegations, Plaintiff Levitt asked for Defendants to provide and pay for promotional materials including, for example, pop-up awnings, banners, brochures, and decals, and to fund product contingency programs for both CCS and WERA road racing series.

20.     Defendants deny the allegations contained in Paragraph 20 of the Complaint, except admit that Plaintiff Levitt may have distributed product with Defendants' SPEEDCELL Marks as early as January 2009, which was after Defendants were already selling SPEEDCELL products in the marketplace.  The SPEEDCELL S logo was not finalized until

after the date Plaintiffs allege that they first used such a logo, demonstrating the falsity of their allegations.

21.     Defendants are without sufficient information to either confirm or deny when Levitt first attempted to usurp Defendants' business by incorporating Full Spectrum Power, and therefore deny the allegations contained in Paragraph 21 of the Complaint.

22.     Defendants deny the allegations contained in Paragraph 22 of the Complaint, except admit that as a non-exclusive distributor of Defendants' SPEEDCELL products, Plaintiff Levitt would have had interface with Defendants' customers on the East Coast. Defendants also specifically state that Plaintiffs did not pay their bills timely and still owe Defendants thousands of dollars for batteries shipped to Plaintiffs.

23.     Defendants deny the allegations contained in Paragraph 23 of the Complaint.

24.     Defendants deny the allegations contained in Paragraph 24 of the Complaint.

25.     Defendants are without sufficient information to either confirm or deny Levitt's understanding of Kauffman's actions and statements, but deny the allegations contained in Paragraph 25 of the Complaint.

26.     Defendants deny the allegations contained in Paragraph 26 of the Complaint, except admit that Plaintiffs are improperly selling batteries which display Defendants' SPEEDCELL Marks.  Defendants are without sufficient information to either confirm or deny whether safety related incidents have been brought to the attention of Plaintiffs, and therefore deny same.

27.     Defendants deny that they are required to request or otherwise seek "Levitt's consent, authorization, or a license to use" Defendants' own SPEEDCELL Marks.  Defendants deny any and all remaining factual allegations contained in Paragraph 27 of the Complaint.

28.     Defendants deny the allegations contained in Paragraph 28 of the Complaint, except admit that Defendants are permitted to manufacture and sell batteries with Defendants' SPEEDCELL Marks.

29.     Defendants admit the allegations contained in Paragraph 29 of the Complaint.

30.     Defendants deny the allegations contained in Paragraph 30 of the Complaint, except admit that Defendants sell batteries to customers within the motorcycle racing industry.

31.     Defendants are without sufficient information to either confirm or deny the allegations contained in Paragraph 31 of the Complaint, and therefore deny same.

32.     Defendants are without sufficient information to either confirm or deny the allegations contained in Paragraph 32 of the Complaint, and therefore deny same.

33.     Defendants deny the allegations contained in Paragraph 33 of the Complaint, except admit that Navitus filed an application for trademark with the U.S. Patent and Trademark Office ("USPTO") on October 30, 2009, and included photographs of Defendants' SPEEDCELL Marks.

34.     Defendants deny the allegations contained in Paragraph 34 of the Complaint, and state that the February 4, 2010 letter speaks for itself.

35.     Defendants deny the allegations contained in Paragraph 35 of the Complaint, except admit that Kauffman contacted Levitt to ensure that Levitt did not attempt to steal Defendants' property.

36.     Defendants deny the allegations contained in Paragraph 36 of the Complaint, and state that the referenced electronic posting speaks for itself.

37.     Defendants are without sufficient information to either confirm or deny the allegations contained in Paragraph 37 of the Complaint, and therefore deny same.

38.    Defendants deny the allegations contained in Paragraph 38 of the Complaint, and state that the referenced electronic posting speaks for itself.

39.    Defendants are without sufficient information to either confirm or deny the allegations  contained in Paragraph 39 of the Complaint, and therefore deny same.

40.    Defendants state that they have not been required to "offer evidence or support" of an online posting alleged by Plaintiffs, and Defendants deny any remaining allegations contained in Paragraph 40 of the Complaint.

**<u>Count I</u>**
**Trade Libel and Product Disparagement Under Section 43(A)**
**of the Lanham Act (15 U.S.C. §1125(A)(1)(B))**

41.    Defendants hereby incorporate their answers to Paragraphs 1-40 of the Complaint as if fully stated herein.

42.    Defendants deny the allegations contained in Paragraph 42 of the Complaint.

43.    Defendants deny the allegations contained in Paragraph 43 of the Complaint.

44.    Defendants deny the allegations contained in Paragraph 44 of the Complaint.

45.    Defendants deny the allegations contained in Paragraph 45 of the Complaint.

46.    Defendants state that they have not been required to "offer evidence or support" of an online posting alleged by Plaintiffs, and Defendants deny any remaining allegations contained in Paragraph 46 of the Complaint.

47.    Defendants deny the allegations contained in Paragraph 47 of the Complaint.

48.    Defendants deny the allegations contained in Paragraph 48 of the Complaint.

49.    Defendants deny the allegations contained in Paragraph 49 of the Complaint.

50.    The allegations contained within Paragraph 50 of the Complaint contain conclusions of law, to which no response is required. To the extent that the allegations contained within this Paragraph are factual in nature, the allegations are denied.

51.     Defendants deny the allegations contained in Paragraph 51 of the Complaint, and specifically deny that they have engaged in any misrepresentations.  Defendants further question why their East Coast distributor would allege in the Complaint that Plaintiffs were acting in "direct commercial competition" with Defendants unless Plaintiffs had a plan all along to steal and usurp Defendants' business ideas, intellectual property, and identity in the marketplace.

52.     Defendants deny the allegations contained in Paragraph 52 of the Complaint, and specifically deny that they engaged in "misrepresentation."  Defendants specifically deny that Plaintiffs, as Defendants' non-exclusive East Coast distributor, could prevent Defendants from selling Defendants' own batteries to consumers in the motorcycle racing industry.

53.     The allegations contained within Paragraph 53 of the Complaint contain conclusions of law, to which no response is required. To the extent that the allegations contained within this Paragraph are factual in nature, the allegations are denied.

54.     The allegations contained within Paragraph 54 of the Complaint contain conclusions of law, to which no response is required. To the extent that the allegations contained within this Paragraph are factual in nature, the allegations are denied.

55.     The allegations contained within Paragraph 55 of the Complaint contain conclusions of law, to which no response is required. To the extent that the allegations contained within this Paragraph are factual in nature, the allegations are denied.  Defendants specifically deny that they have caused any harm to Plaintiffs.

56.     The allegations contained within this Paragraph contain conclusions of law, to which no response is required. To the extent that the allegations contained within this Paragraph are factual in nature, the allegations are denied.

## Count II
### (False Designation of Origin Unfair Competition Under Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)))

57.     Defendants hereby incorporate their answers to Paragraph numbers 1-56 of the Complaint as if fully stated herein.

58.     Defendants deny the allegations contained in Paragraph 58 of the Complaint, and vehemently deny that Defendants are somehow prevented from using Defendants' own SPEEDCELL Marks.

59.     Defendants deny the allegations contained in Paragraph 59 of the Complaint, and vehemently deny that Defendants are somehow prevented from using Defendants' own SPEEDCELL Marks.

60.     Defendants deny the allegations contained in Paragraph 60 of the Complaint, and vehemently deny that Defendants are somehow prevented from using Defendants' own SPEEDCELL Marks.

61.     The allegations contained within Paragraph 61 of the Complaint contain conclusions of law, to which no response is required. To the extent that the allegations contained within this Paragraph are factual in nature, the allegations are denied.

62.     Defendants deny the allegations contained in Paragraph 62 of the Complaint. Defendants specifically deny that they have caused any harm to Plaintiffs.

63.     Defendants deny the allegations contained in Paragraph 63 of the Complaint.

## Count III
### (Trademark Infringement Under Section 32 of the Lanham Act (15 U.S.C. §1114(1)))

64.     Defendants hereby incorporate their answers to Paragraph numbers 1-63 of the Complaint as if fully stated herein.

65.     Defendants deny the allegations contained in Paragraph 65 of the Complaint.

66.     Defendants deny that they are required to request or otherwise seek "license, consent, or other authorization" from Plaintiffs to use Defendants' own SPEEDCELL Marks. Defendants deny any and all remaining factual allegations contained in Paragraph 66 of the Complaint.

67.     Defendants deny that they are required to request or otherwise seek "license, consent, or other authorization" from Plaintiffs to use Defendants' own SPEEDCELL Marks. Defendants deny any and all remaining factual allegations contained in Paragraph 67 of the Complaint.

68.     Defendants deny that they are required to request or otherwise seek "license, consent, or other authorization" from Plaintiffs to use Defendants' own SPEEDCELL Marks. Defendants deny any and all remaining factual allegations contained in Paragraph 68 of the Complaint.

69.     Defendants deny that they are required to request or otherwise seek "license, consent, or other authorization" from Plaintiffs to use Defendants' own SPEEDCELL Marks. Defendants deny any and all remaining factual allegations contained in Paragraph 69 of the Complaint.

70.     Defendants deny the allegations contained in Paragraph 70 of the Complaint, and specifically deny that Defendants are somehow prevented from marketing and selling products with Defendants' own SPEEDCELL Marks.

71.     Defendants deny the allegations contained in Paragraph 71 of the Complaint, and specifically deny that Defendants are somehow prevented from marketing and selling products with Defendants' own SPEEDCELL Marks.

72.     Defendants deny the allegations contained in Paragraph 72 of the Complaint, and specifically deny that Defendants are somehow prevented from marketing and selling products with Defendants' own SPEEDCELL Marks.

73.     Defendants deny the allegations contained in Paragraph 73 of the Complaint, and specifically deny that Defendants are somehow prevented from marketing and selling products with Defendants' own SPEEDCELL Marks.  Defendants also specifically deny that they have caused any harm to Plaintiffs.

74.     Defendants deny the allegations contained in Paragraph 74 of the Complaint, and specifically deny that Defendants are somehow prevented from marketing and selling products with Defendants' own SPEEDCELL Marks.

75.     The allegations contained within Paragraph 75 of the Complaint contain conclusions of law, to which no response is required. To the extent that the allegations contained within this Paragraph are factual in nature, the allegations are denied.

76.     Defendants deny the allegations contained in Paragraph 76 of the Complaint, and specifically deny that Defendants are somehow prevented from marketing and selling products with Defendants' own SPEEDCELL Marks.  Defendants also specifically deny that they have caused any harm to Plaintiffs.

77.     The allegations contained within Paragraph 77 of the Complaint contain conclusions of law, to which no response is required. To the extent that the allegations contained within this Paragraph are factual in nature, the allegations are denied.

## Count IV
### (Trademark Dilution Under Section 43(C) of the Lanham Act (15 U.S.C. § 1125(C)))

78.     Defendants hereby incorporate their answers to Paragraph numbers 1-77 of the Complaint as if fully stated herein.

79.    Defendants deny the allegations contained in Paragraph 79 of the Complaint, and specifically deny that Plaintiffs acquired any rights in the SPEEDCELL Marks.

80.    Defendants deny the allegations contained in Paragraph 80 of the Complaint, and specifically deny that Defendants are somehow prevented from marketing and selling products with Defendants' own SPEEDCELL Marks.

81.    Defendants deny the allegations contained in Paragraph 81 of the Complaint, and specifically deny that Defendants are somehow prevented from marketing and selling products with Defendants' own SPEEDCELL Marks..

82.    The allegations contained within Paragraph 82 of the Complaint contain conclusions of law, to which no response is required. To the extent that the allegations contained within this Paragraph are factual in nature, the allegations are denied.

83.    Defendants deny the allegations contained in Paragraph 83 of the Complaint.

84.    Defendants deny the allegations contained in Paragraph 84 of the Complaint.

85.    The allegations contained within this Paragraph contain conclusions of law, to which no response is required. To the extent that the allegations contained within this Paragraph are factual in nature, the allegations are denied.

**Count V**
**(Cybersquatting Under Section 43(d) of the Lanham Act (15 U.S.C. § 1125(d)))**

86.    Defendants hereby incorporate their answers to Paragraph numbers 1-85 of the Complaint as if fully stated herein.

87.    The allegations contained within Paragraph 87 of the Complaint contain conclusions of law, to which no response is required. To the extent that the allegations contained within this Paragraph are factual in nature, the allegations are denied.

88.    Defendants deny the allegations contained in Paragraph 88 of the Complaint, and specifically deny that Plaintiffs acquired any rights in the SPEEDCELL Marks.

89.    Defendants deny the allegations contained in Paragraph 89 of the Complaint, and specifically deny that Plaintiffs acquired any rights in the SPEEDCELL Marks.

90.    Defendants deny the allegations contained in Paragraph 90 of the Complaint, and specifically deny that Plaintiffs acquired any rights in the SPEEDCELL Marks.

91.    Defendants deny the allegations contained in Paragraph 91 of the Complaint.

92.    Defendants deny the allegations contained in Paragraph 92 of the Complaint.

93.    The allegations contained within Paragraph 93 of the Complaint contain conclusions of law, to which no response is required. To the extent that the allegations contained within this Paragraph are factual in nature, the allegations are denied.

94.    Defendants deny the allegations contained in Paragraph 94 of the Complaint.

## Count VI
### (Statutory Mark Infringement under Virginia Law (Va. Code § 59.1-92.12))

95.    Defendants hereby incorporate their answers to Paragraph numbers 1-94 of the Complaint as if fully stated herein.

96.    Defendants deny the allegations contained in Paragraph 96 of the Complaint and specifically state that any action taken by Plaintiffs using Defendants' SPEEDCELL Marks in the Commonwealth of Virginia would have been solely as Defendants' no-exclusive distributor.

97.    Defendants deny the allegations contained in Paragraph 97 of the Complaint, except admit that *Plaintiffs* are improperly using *Defendants'* SPEEDCELL Marks if they are selling and advertising the SPEEDCELL line of batteries within Virginia or elsewhere.

98.     Defendants deny that they are required to request or otherwise seek "license, consent, or other authorization" from Plaintiffs to use Defendants' own SPEEDCELL Marks. Defendants deny any and all remaining factual allegations contained in Paragraph 98 of the Complaint.

99.     Defendants deny that they are required to request or otherwise seek "license, consent, or other authorization" from Plaintiffs to use Defendants' own SPEEDCELL Marks. Defendants deny any and all remaining factual allegations contained in Paragraph 99 of the Complaint.

100.     Defendants deny the allegations contained in Paragraph 100 of the Complaint, and specifically deny that Defendants are somehow prevented from marketing and selling products with Defendants' own SPEEDCELL Marks.

101.     Defendants deny the allegations contained in Paragraph 101 of the Complaint, and specifically deny that Defendants are somehow prevented from marketing and selling products with Defendants' own SPEEDCELL Marks.

102.     Defendants deny the allegations contained in Paragraph 102 of the Complaint, and specifically deny that Defendants are somehow prevented from marketing and selling products with Defendants' own SPEEDCELL Marks.  Defendants also specifically deny that they have caused any harm to Plaintiffs.

103.     Defendants deny the allegations contained in Paragraph 103 of the Complaint, and specifically deny that Defendants are somehow prevented from marketing and selling products with Defendants' own SPEEDCELL Marks.

104.     The allegations contained within Paragraph 104 of the Complaint contain conclusions of law, to which no response is required. To the extent that the allegations contained within this Paragraph are factual in nature, the allegations are denied.

105.    Defendants deny the allegations contained in Paragraph 103 of the Complaint, and specifically deny that Defendants have caused any harm to Plaintiffs.

### Count VII
### (Common Law Product Disparagement)

106.    Defendants hereby incorporate their answers to Paragraph numbers 1-105 of the Complaint as if fully stated herein.

107.    Defendants deny the allegations contained in Paragraph 107 of the Complaint.

108.    Defendants deny the allegations contained in Paragraph 108 of the Complaint.

109.    Defendants deny the allegations contained in Paragraph 109 of the Complaint.

110.    Defendants deny the allegations contained in Paragraph 110 of the Complaint.

111.    Defendants state that they have not been required to offer evidence or support of an online posting alleged by Plaintiffs.  Defendants are without sufficient information to either confirm or deny the allegations that the safety of Full Spectrum products has been brought to the attention of Plaintiffs. Defendants deny the remaining allegations contained in Paragraph 111 of the Complaint.

112.    Defendants deny the allegations contained within Paragraph 112 of the Complaint.

113.    Defendants deny the allegations contained in Paragraph 113 of the Complaint.

114.    Defendants deny the allegations contained in Paragraph 114 of the Complaint.

115.    Defendants deny the allegations contained in Paragraph 115 of the Complaint.

### Count VIII
### (Common Law Commercial Defamation)

116.    Defendants hereby incorporate their answers to Paragraph numbers 1-115 of the Complaint as if fully stated herein.

117.    Defendants deny the allegations contained in Paragraph 117 of the Complaint.

118.     Defendants deny the allegations contained in Paragraph 118 of the Complaint

119.     Defendants deny the allegations contained in Paragraph 119 of the Complaint.

120.     Defendants deny the allegations contained in Paragraph 120 of the Complaint.

121.     Defendants deny the allegations contained in Paragraph 121 of the Complaint.

### Count IX
### (Intentional Interference with Prospective Economic Advantage)

122.     Defendants hereby incorporate their answers to Paragraph numbers 1-121 of the Complaint as if fully stated herein.

123.     Defendants deny the allegations contained in Paragraph 123 of the Complaint, except admit that Levitt and Full Spectrum appear to have sold batteries to the motorcycle racing industry.

124.     This allegation lacks a timeframe, and therefore Defendants are without sufficient information to either confirm or deny the allegations contained in Paragraph 124 of the Complaint, and therefore deny same.

125.     Defendants deny the allegations contained in Paragraph 125 of the Complaint.

126.     Defendants are without sufficient information to either confirm or deny the allegations contained in Paragraph 126 of the Complaint, and therefore deny same.

127.     Defendants are without sufficient information to either confirm or deny the allegations contained in Paragraph 127 of the Complaint, and therefore deny same.

128.     Defendants are without sufficient information to either confirm or deny the allegations contained in Paragraph 128 of the Compliant, and therefore deny same. Defendants specifically state that, absent a distributor agreement with Defendants, Plaintiffs are not permitted to sell and profit on Defendants' SPEEDCELL Marks in any event.

129.     Defendants deny the allegations contained in Paragraph 129 of the Complaint.

130.    Defendants deny the allegations contained in Paragraph 130 of the Complaint

## Count X
### (Common Law Mark Infringement)

131.    Defendants hereby incorporate their answers to Paragraph numbers 1-130 of the Complaint as if fully stated herein.

132.    Defendants deny the allegations contained in Paragraph 132 of the Complaint.

133.    Defendants deny the allegations contained in Paragraph 133 of the Complaint, except admit that Defendants have every right to use Defendants' SPEEDCELL Marks to the exclusion of Plaintiffs and all others.

134.    Defendants deny the allegations contained in Paragraph 134 of the Complaint, and specifically deny that Plaintiffs have any right to use the SPEEDCELL mark or logo.

135.    Defendants deny the allegations contained in Paragraph 135 of the Complaint, and specifically deny that Plaintiffs have any right to use the SPEEDCELL mark or logo.

136.    Defendants deny the allegations contained in Paragraph 136 of the Complaint, and specifically deny that Plaintiffs have any right to use a SPEEDCELL mark or logo.

137.    Defendants deny the allegations contained in Paragraph 137 of the Complaint, and specifically deny that Plaintiffs have any right to use a SPEEDCELL mark or logo

138.    Defendants deny the allegations contained in Paragraph 138 of the Complaint.

## Count XI
### (Common Law Unfair Competition)

139.    Defendants hereby incorporate their answers to Paragraph numbers 1-138 of the Complaint as if fully stated herein.

140.    Defendants deny the allegations contained in Paragraph 140 of the Complaint, except admit that Defendants have every right to use Defendants' SPEEDCELL Marks to the exclusion of Plaintiffs and all others.

141.    Defendants deny the allegations contained in Paragraph 141 of the Complaint, except admit that Defendants have every right to use Defendants' SPEEDCELL Marks to the exclusion of Plaintiffs and all others.

142.    The allegations contained within Paragraph 142 of the Complaint contain conclusions of law, to which no response is required. To the extent that the allegations contained within this Paragraph are factual in nature, the allegations are denied.

143.    Defendants deny the allegations contained in Paragraph 143 of the Complaint.

144.    Defendants deny the allegations contained in Paragraph 144 of the Complaint.

145.    Defendants deny the allegations contained in Paragraph 145 of the Complaint

### Count XII
### (Declaratory Judgment on Ownership of the Mark)

146.    Defendants hereby incorporate their answers to Paragraph numbers 1-145 of the Complaint as if fully stated herein.

147.    Defendants admit the allegations contained in Paragraph 147 of the Complaint.

148.    Defendants deny the allegations contained in Paragraph 148 of the Complaint.

149.    Defendants deny the allegations contained in Paragraph 149 of the Complaint.

150.    Defendants deny the allegations contained in Paragraph 150 of the Complaint.

151.    Paragraph 151 of the Complaint does not contain any factual allegations to which a response is required. To the extent that any factual allegations are contained in Paragraph 151, they are denied.

### Count XIII
### (Declaratory Judgment on Infringement of the Mark)

152.    Defendants hereby incorporate their answers to Paragraph numbers 1-145 of the Complaint as if fully stated herein.

153.    Defendants admit the allegations contained in Paragraph 153 of the Complaint.

154.    Defendants admit that Plaintiffs have infringed Defendants' SPEEDCELL Marks. Defendants deny all remaining allegations contained in Paragraph 154 of the Complaint.

155.    Defendants deny the allegations contained in Paragraph 155 of the Complaint.

156.    Defendants deny the allegations contained in Paragraph 156 of the Complaint.

157.    Defendants deny the allegations contained in Paragraph 157 of the Complaint.

158.    Any allegation not specifically admitted or denied is expressly denied.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

Plaintiffs' claims are barred because Plaintiffs are not the owners of any of the rights asserted in Plaintiffs' Complaint, including, but not limited to, the SPEEDCELL mark and the SPEEDCELL S logo.  Defendants developed the SPEEDCELL products, the SPEEDCELL name, and paid for a third party to assist with the design of the SPEEDCELL S mark and logo.

### Second Affirmative Defense

Plaintiffs' claims are barred because Defendants used the SPEEDCELL mark well before Plaintiffs' allege first use of the SPEEDCELL S mark and logo.  Indeed, Defendants were selling SPEEDCELL products as early as mid-2008, long before Plaintiffs purchased their first SPEEDCELL battery from Defendants.

### Third Affirmative Defense

Plaintiffs' claims are barred because Levitt was merely a non-exclusive distributor of Defendants' SPEEDCELL products.  At no time were Plaintiffs ever in a partnership with Defendants and never shared profits and losses.  Moreover, Plaintiff Levitt acknowledged publicly and privately that he was not a partner in Defendants' business.  Nevertheless, Levitt

18

established Full Spectrum Power, apparently with the intent to usurp Defendants' rights in the valuable SPEEDCELL product franchise.

### Fourth Affirmative Defense

Plaintiffs' claims are barred by virtue of a false application to the USPTO seeking to register the SPEEDCELL S mark and logo.  On information and belief, Plaintiff Levitt could not have used the SPEEDCELL S mark and logo on January 1, 2009 as alleged because the design had not yet been selected by that date.

### Fifth Affirmative Defense

Plaintiffs' claims are barred because Defendants never relinquished any rights in the business and have continuously offered for sale SPEEDCELL products from 2008 to the present. Indeed, Plaintiffs continued to purchase products from Defendants even after the date Plaintiffs allege Kauffman "withdrew" from the battery business.

### Sixth Affirmative Defense

The Complaint fails to state a claim upon which relief may be granted.

### Seventh Affirmative Defense

Plaintiffs' claims are barred by Plaintiffs' unclean hands.

### Eighth Affirmative Defense

Plaintiffs' claims must fail because Plaintiffs have not suffered recoverable damages.

### Ninth Affirmative Defense

Plaintiffs' claims are barred, in whole or in part, by failure of consideration and/or lack of mutuality of obligation.

### Tenth Affirmative Defense

Plaintiffs' claims are barred, in whole or in part, for failure to mitigate any alleged damages and by Plaintiffs' own conduct.

### Eleventh Affirmative Defense

Plaintiffs' claims are barred by waiver and/or estoppel.

### Twelfth Affirmative Defense

Plaintiffs' claims are barred, in whole or in part, by failure of the parties to agree on definite, material terms.

### Thirteenth Affirmative Defense

Plaintiffs' claims are barred, in whole or in part, by the doctrines of privilege and justification.

### Fourteenth Affirmative Defense

Plaintiffs' claims are barred, in whole or in part, by impossibility, impracticability, frustration of purpose, and superseding and intervening causes.

### Fifteenth Affirmative Defense

Plaintiffs' claims are barred, in whole or in part, by truth.

### Sixteenth Affirmative Defense

Plaintiffs do not have standing to assert the causes of action against Defendants.  On information and belief, Full Spectrum Power does not own any of the licensed rights or possess the requisite standing to assert the causes of action against Defendants.

### Seventeenth Affirmative Defense

Defendant reserves the right to assert additional affirmative defenses that may become known.

WHEREFORE, Defendants Joshua Kauffman and Navitus Group, LLC respectfully request that this Court dismiss the Complaint in its entirety, and grant such further relief as this Court deems proper.

## COUNTERCLAIM

Joshua Kauffman ("Kauffman") and Navitus Group, LLC ("Navitus") (collectively "Counterclaimants"), by and through counsel, assert this Counterclaim against Jason Levitt ("Levitt") and Full Spectrum Power LLC ("Full Spectrum") (collectively "Plaintiffs") and allege as follows:

### Parties

1.      Counterclaimant Kauffman is an individual citizen of the State of New Mexico.

2.      Counterclaimant Navitus is a New Mexico limited liability corporation with its principal place of business at 3220 Estrada Group, Mesilla, NM 88046.

3.      Counterclaimants are in the business of, among other things, the research, development, manufacturing, and selling of motorcycle batteries.

4.      Upon information and belief, Plaintiff Levitt is an individual residing in the Commonwealth of Virginia.

5.      Upon information and belief, Plaintiff Full Spectrum is a Virginia limited liability corporation with its principal place of business at 1069 W Broad Street, #791, Falls Church, VA 22046.

### Jurisdiction and Venue

6.      This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

7.      Venue is appropriate pursuant to 28 U.S.C. § 1391(a) because Plaintiffs reside in this district.

### Factual Background

8.      For about the past ten (10) years, Kauffman has developed an expertise in advanced battery technology from which he alone, without any assistance from Plaintiffs, developed the SPEEDCELL battery technology at issue in this lawsuit.

9.      Kauffman served in the United States Marine Corps from 1990 to 2005 where he was first exposed to renewable and disposable battery technology after obtaining the 0321 reconnaissance Military occupation specialty.  Kauffman developed further expertise in battery technology through his experiences in, for example, global comm shots, explosives, and small arms while in the Marine Corps.

10.     In 2003, Kauffman was honorably discharged from the U.S. military when he was recruited by the United States Department of Defense to work at the US Army Soldier Systems Center in Natick, Massachusetts.  Although the name and function of Kauffman's unit remains classified, its mission statement was the technical advancement of current and future Special Operation War fighters.

11.     While working at the US Army Soldier Systems Center, Kauffman began to develop an expertise in very advanced Lithium-based battery technology.   Kauffman understood that this technology could be improved for commercial use as it could produce large amounts of energy in very small packages.

12.     Kauffman also developed close relationships with the engineers and companies that produce these type of batteries and perfected the use of high-level production of very specialized CNC machines, advanced welding technologies, and specialized material / metallurgical developments.

13.     In or about late 2006, Kauffman was introduced to and became friends with an individual named Thorsten Durbahn of Durbahn Plastics in Germany.  Kauffman purchased

sophisticated engine components from Durbahn, and Durbahn purchased linear sensors from Kauffman.  Durbahn then approached Kauffman to do machining work for some products Durbahn was developing for the Ducati 1098 motorcycle.

14.     As early as 2007, while still employed at the US Army Soldier Systems Center, Kauffman began to experiment on his own time constructing batteries for small engine applications (such as motorcycles).

15.     Initially, Kauffman was procuring hobby-grade cells from mostly open sources over the internet and in hobby stores.  Soon, Kauffman began to make contacts in the industry when he could purchase more powerful cells and researched how to start his own business.

16.     In early 2007, Kauffman resigned his position at the US Army Soldier Systems Center and started his own business, combining his battery expertise with his motorcycle industry interests and connections.

17.     By March, 2007, Kauffman was serving as Durbahn's sole US importer under the name Metric Twins.  Kauffman registered the domain name www.metrictwins.com on March 7, 2007.

18.     At the time, Kauffman was focused on perfecting a method to deliver high current consistently in the battery.  This was a challenge because the current practice of using Hyperion type or fixed amperage / bus bars for cell interconnects overheated causing internal resistance of the cells to increase.  This would then cause diminishing returns on overall current delivered in addition to reducing the total amount of voltage hold up available, thereby compromising multiple engine starts.

19.     Another challenge for Kauffman's development of the SPEEDCELL battery was individual cell imbalance after the third high current discharge.  This was repeatable in multiple battery systems and thus presented another major issue as cell imbalance can cause

cell instability and diminished longevity.  One of the major contributing factors was the quality of the cells themselves.

20.     Kauffman then began to purchase and experiment with military grade A cells in various applications, including use as motorcycle batteries.

21.     Ultimately, Kauffman solved these technical challenges, and in the process created valuable trade secrets for the SPEEDCELL business.

22.     Once Kauffman was able to achieve successful laboratory trials, he conducted live test runs in motorcycles in June 2007.  The very first live test run was in Kauffman's Ducati 999s.  Kauffman rode as much as he could over a nine-month period to put as many hours as possible on the battery.

23.     For the entire nine month period, Kauffman performed countless lab tests in addition to street trials.  Kauffman knew he needed long-term testing up to a year.

24.     As Kauffman was testing the batteries, he started to consider names for his business.  He recognized that it would be best to have a separate name for the motorsports division of the battery company to focus on lightweight and racing.  That is how "Lightweight Energy Solutions" was born.

25.     The term "Lightweight Energy Solutions" is a trademark of Counterclaimants and was recently published by the USPTO as a registrable mark.  See Serial Number: 77-898,586, published on April 6, 2010.

26.     Kauffman then toyed with the name "Speedpacks" but, by early 2008, settled on "SPEEDCELL."

27.     On February 26, 2008, Kauffman tried to register the domain name www.speedcell.com, which was not available at the time.  Kauffman purchased www.speedcell.org instead, as well as a "Domain Alert Pro Monitoring package" for the

domain www.speedcell.com.  This was a service offered by Godaddy.com to let Kauffman know when www.speedcell.com would be available.

28.     From and after early 2008, Counterclaimants continually used "SPEEDCELL" and "Lightweight Energy Solutions" in the marketplace.

29.     Between early 2008 and early 2009, Kauffman's SPEEDCELL business devoted countless hours to refinement of the battery technology, and produced and sold about eighty (80) SPEEDCELL batteries prior to January 2009.  Significant numbers of additional SPEEDCELL batteries had been provided to racers, dealers, and teams across the country for evaluation and promotional purposes.

30.     Sometime after Levitt learned that Kauffman had become an importer for Durbahn products, Levitt approached Kauffman about sponsoring parts of a RC51 motorcycle Levitt raced by providing Levitt with specialized parts Kauffman received from Durbahn.

31.     From one of the first shipments Kauffman received from Durbahn, Kauffman shipped Levitt a $600 carbon airbox for free and paid for Levitt's cams to be cryogenically treated ($350).  In exchange, Levitt placed Metric Twins stickers on his bike during the race.

32.     It was clear to Kauffman that Levitt had no experience with the development of motorcycle hardware, and Levitt was merely a user of specialized parts on his racing motorcycle.  Levitt informed Kauffman that he had a full-time job with a consulting company in Virginia.

33.     At the time Kauffman first met Levitt, Kauffman did not show his battery technology to Levitt.

34.     In March 2008, Kauffman contacted Steve Hill of Robotic Power Solutions to purchase military-grade cells, and also spoke with Mr. Hill about Robotic Power Solutions' experience in building private label battery systems.

35.     On April 15, 2008, Kauffman purchased more military grade A123 cells and K2 cells from Robotic Power Solutions, and with further testing, Kauffman solved his last remaining technical issues.  Kauffman's subsequent test trials were successful.

36.     Kauffman then contacted Roger Heemsbergen, the owner of Arroyo Seco Raceway near Kauffman's house in New Mexico.  Heemsbergen is a former professional motorcycle racer who raced the entire 2008 summer season with Kauffman's prototype battery without any failures.

37.     By late July 2008, Kauffman was selling SPEEDCELL battery systems throughout the United States.

38.     In early August 2008, Kauffman shared with Durbahn that he had developed and successfully tested a lightweight battery for motorcycles. Durbahn asked if it could test one of Kauffman's SPEEDCELL batteries.  Kauffman agreed, and Durbahn's tests were 100% successful.

39.     In August 2008, Heemsbergen became Kauffman's first SPEEDCELL dealer. He acquired two 4.6Ah Superbike batteries and two 2.3Ah Supersport batteries, plus one charger.  In addition, Kauffman supplied Heemsbergen with a SPEEDCELL dealer handbook.

40.     By September 2008, word was getting out that Kauffman was selling quite a few SPEEDCELL batteries.

41.     As the SPEEDCELL battery was catching on in the marketplace in September 2008, Levitt discovered that the SPEEDCELL battery was Kauffman's creation.

42.     When Kauffman next spoke with Levitt, however, Levitt did not want to use the SPEEDCELL battery on one on his racing bikes because Levitt did not want to risk have reliability issues with such ground-breaking technology.  Levitt stated that he would "wait-and-see."

43.    Prior to meeting Kauffman, Levitt had never used a lightweight battery similar to the SPEEDCELL battery designed by Kauffman.

44.    However, as the popularity of the SPEEDCELL battery grew, Levitt contacted Kauffman by early October 2008 to request that Kauffman sponsor his team by providing a SPEEDCELL battery.  Kauffman obliged and provided Levitt with a SPEEDCELL battery.

45.    On October 10, 2008, Levitt contacted Kauffman with questions about the SPEEDCELL battery and its interface with the bike.

46.    As of October 2008, Levitt was not involved in the motorcycle battery business, whether manufacturing, distribution, or otherwise.

47.    Roughly two weeks later, Levitt complained that the battery did not work very well, and he had switched back to his old lead acid system.  Kauffman requested that Levitt return the battery to see if there was a problem, but to date, Levitt has never returned this battery.

48.    By late October 2008, Kauffman's SPEEDCELL battery was receiving many positive reviews on internet forums, and the demand for the battery was increasing.

49.    Levitt was very active on many internet forums, and upon information and belief, Levitt, unbeknownst to Kauffman, devised a plan to insert himself into Kaufman's SPEEDCELL business at a time when Levitt was about to lose his job at the consulting company.

50.    At first, Levitt offered to be a voice of support on internet forums.

51.    On November 1, 2008, Kauffman made an internet post on the Speedzilla forum as the "owner" of SPEEDCELL Technologies and provided some technical data about the company and its batteries.  Levitt chimed in on the post thread in support only.

52.     Levitt had no involvement with Kauffman's SPEEDCELL company, had not spent years developing the technology, had not shared in the expenses of developing the technology, nor did Levitt suggest in a public forum that he had any involvement with the ownership of SPEEDCELL or the design or development of SPEEDCELL products.

53.     Kauffman's internet posts clearly displayed Kauffman's SPEEDCELL copyright marks.

54.     By November 2008, Kauffman personally designed the very first SPEEDCELL Technologies logo which incorporated the phrase "Lightweight Energy Solutions" in the logo itself.  Kauffman engaged a local graphics company to help with the design layout and produce the stickers.

55.     In late 2008, through discussions with Martin Wong (CEO of Motowheels), Counterclaimants agreed to make Motowheels a SPEEDCELL dealer.  Motowheels first purchased SPEEDCELL products on or about December 29, 2008.

56.     In early November 2008, Durbahn ordered twenty-one (21) batteries from Kauffman.  Durbahn was so pleased with Kauffman's SPEEDCELL batteries that it asked to be the European importer for SPEEDCELL.

57.     On November 11, 2008, Kauffman registered the domain name www.speedcell.eu which Kauffman still owns and is still active.

58.     As the popularity of Kauffman's SPEEDCELL batteries had grown, Kauffman was busy developing and testing the next generation battery and had already made arrangements with Robotic Power Solutions to private label the production of the batteries because Kauffman was too busy in the development phase.

59.     By mid-November 2008, Levitt asked if he could assist in selling the batteries.

60.     In an effort to free up some additional time for research, development, and testing the SPEEDCELL batteries and *not expecting Levitt to use the opportunity to learn about and attempt to steal Kauffman's business*, Kauffman agreed that Levitt could serve as a non-exclusive distributor of SPEEDCELL batteries on the East Coast of the United States.

61.     Kauffman made it clear to Levitt that Levitt would not have an exclusive distributor arrangement, and Levitt was well aware of the pre-existing arrangements Kauffman had, including with Motowheels.  Indeed, on several occasions, Levitt pleaded with Kauffman to sever the relationship with Motowheels.

62.     Throughout his distributor relationship with Kauffman as a distributor of SPEEDCELL batteries, Levitt would purchase batteries developed and manufactured by Kauffman, and Levitt was then permitted to re-sell the batteries to the East Coast market.

63.     At no time did Kauffman suggest or agree that Levitt would become a partner in the business or have any interest in the SPEEDCELL business whatsoever.

64.     On December 29, 2008, Levitt posted in the same Speedzilla thread that he had would be selling Kauffman's SPEEDCELL batteries and that they were ready to ship.

65.     Throughout this process, and possibly in furtherance of a plan to steal Kauffman's technology and SPEEDCELL business line, Levitt began to ask Kauffman technical questions.

66.     By January 2009, Kauffman decided that he needed to improve the SPEEDCELL logo because the first design was too busy and not easily recognizable like, for example, the Chevrolet, or Pepsi logo.

67.     Kauffman mentioned his desire to improve the logo to Levitt, and Levitt suggested that Kauffman use one of his acquaintances (Joseph Buckland) at Levitt's employer Booz Allen Hamilton  who was looking for side work as a graphic artist.

68.     Kauffman agreed to hire Buckland and pay for his services, after which Buckland prepared several more modern logo choices for Kauffman to review.  Ultimately, Kauffman chose the current SPEEDCELL S logo.

69.     Levitt had nothing to do with development of the SPEEDCELL logo except suggest that Kauffman speak to Mr. Buckland.

70.     Levitt then insisted that Kauffman build a better website so that Levitt could sell batteries directly from Kauffman's website.

71.     Kauffman responded to Levitt that Kauffman's SPEEDCELL business was already at full production capacity, and that Kauffman was not interested in having Levitt sell batteries directly from Kauffman's company's website.  Kauffman's SPEEDCELL business had other dealers/distributors as well.

72.     Without Kauffman's permission or knowledge, Levitt proceeded to register the following domain name www.speed-cell.com.

73.     Levitt registered the domain name www.speed-cell.com even though he knew that Kauffman had already registered www.speedcell.org.

74.     Levitt registered the domain name www.speed-cell.com even though he knew that Kauffman was already using "SPEEDCELL" in the industry.

75.     Levitt registered the domain name www.speed-cell.com even though he knew that Kauffman's batteries already used a logo which contained the word "SPEEDCELL."

76.     Kauffman confronted Levitt after Kauffman learned that Levitt had registered the domain name www.speed-cell.com.

77.     Kauffman told Levitt that he objected to Levitt's attempt to use the domain name www.speed-cell.com.

78.    Levitt apologized and told Kauffman that he would get his ex-wife Amy Levitt, (who specialized in building websites) to redirect www.speedcell.org to www.speed-cell.com and transfer the ownership of the domain name www.speed-cell.com to Kauffman, but to date has not done so.

79.    On January 20, 2009, Levitt's ex-wife Amy uploaded a "splash page" with Kauffman's SPEEDCELL mark and SPEEDCELL S logo only and no content.  Levitt asked Kauffman when Kauffman was planning to add content, and Kauffman responded that it was not a priority because the business was operating at full production capacity already.  Levitt responded "it's your company."

80.    Levitt than asked if he could sell Kauffman's SPEEDCELL batteries from his own website.  Kauffman agreed that Levitt could, as a SPEEDCELL distributor, offer the batteries for sale on his own website, after which Levitt started to use the name "Full Spectrum Power."

81.    When Kauffman heard the name "Full Spectrum Power" Kauffman asked Levitt whether Levitt would be selling many types of batteries, not just Kauffman's SPEEDCELL batteries.

82.    Although Kauffman did not object to Levitt selling batteries from other vendors, Levitt repeatedly assured Kauffman that this was not his intention and he only wanted to sell Kauffman's SPEEDCELL battery because it was the best battery on the market.

83.    After the problems Levitt had caused with the registration of www.speed-cell.com, Kauffman was satisfied that Levitt was starting his own distribution company under a different name so that Levitt would not cause confusion in the market for SPEEDCELL products.

84.   On multiple occasions after Levitt formed Full Spectrum Power, Kauffman reminded Levitt to transfer and sign a bill of sale for the rights to www.speed-cell.com, but Levitt continues to make excuses and to say that it slipped his mind.

85.   Kauffman understood from Levitt that Levitt would only operate under the name Full Power Spectrum from then on.

86.   As of the date of this filing, when www.fullspectrumpower.com is typed into a browser, it re-directs to www.speed-cell.com.

87.   Through Kauffman's own connections in the motorcycle racing industry, Kauffman was, for the most part, able to keep track of Levitt to make sure he was representing himself correctly as the East Coast distributor for Kauffman's SPEEDCELL products.

88.   Levitt expressed to Kauffman that Levitt liked the exposure of being a distributor of Kauffman's SPEEDCELL batteries because as more pro teams used Kauffman's batteries, the more it gave him bragging rights that he sold SPEEDCELL batteries being used by professional racing teams.

89.   Levitt did not, however, like the fact that Kauffman had also developed contacts in the industry.

90.   Levitt also did not like the fact that Kauffman had arrangements with other dealers and distributors.

91.   On many occasions, Levitt asked Kauffman if Kauffman was looking for a partner or investors, and each time Kauffman refused.  By this time, Kauffman had devoted years and significant resources to the business, and it was becoming successful.

92.   Levitt eventually came to realize that Kauffman never wanted a partner and on January 20, 2009 specifically told Kauffman "I doubt you are likely to make me a partner in your business."

93.     Kauffman also never treated Levitt as a partner.  For example, although Levitt knew Kauffman was working on a second generation SPEEDCELL battery, Kauffman never disclosed to Levitt the detailed technical improvements, and never asked or expected Levitt to share expenses for research, development, production, and overhead of the business.

94.     Levitt never shared in any profits or losses in Defendants' business.

95.     Instead, Levitt was at all times, at most, a non-exclusive distributor of SPEEDCELL batteries.

96.     Several months later, Kauffman learned from Levitt that Levitt was about to get fired from his consulting job, and that Levitt would need to rely on the distribution of Kauffman's SPEEDCELL batteries as his primary source of income.

97.     As a result, Levitt asked Kauffman for large discounts on the cost of batteries that he promised to make up for in volume.  Levitt reiterated that this would be his only source of income until he could find another full-time job.

98.     Kauffman reluctantly agreed, and at first, Levitt's order count did not change dramatically.

99.     When Levitt started to place larger orders, Levitt did not pay his bills on time.

100.    Kauffman then learned that Levitt was trying to undercut prices of SPEEDCELL batteries to get a larger market share beyond the East Coast.  This caused another of Kauffman's distributors (Motowheels) to complain that it was forced to cut prices to compete with another distributor.  Levitt was again causing problems for Kauffman.

101.    Kauffman told Levitt that he was not permitted as a distributor to undercut other distributor's prices.

102.    In August 2009, Levitt asked Kauffman for an even greater discount, and complained that Kauffman was charging Levitt too much for shipping.  Kauffman explained to

Levitt that SPEEDCELL only charged him the cost of shipping, and that Levitt received the largest discount already.

103.    Over time, Levitt seemed to become more desperate for money.

104.    Then, Levitt asked Kauffman not to individually package the batteries SPEEDCELL shipped to Levitt and to ship them without logos affixed, not charged or load tested or in their final configuration.

105.    Kauffman was then upset, and asked Levitt to repeat his request.   Levitt repeated the same request and stated that he would hire people to do all of the final prep work that Kauffman's company had to do to the batteries before shipment.

106.    Kauffman refused.  Levitt represented that he was just trying to save money and Kauffman's time commitment so that Levitt could get more batteries sold.   Kauffman still refused and responded that Levitt, as a distributor, was not to be trusted with building the product.

107.    After that, Levitt's orders started to slow with his last order placed on October 21, 2009.

108.    Soon thereafter, Kauffman discovered that Levitt had indeed misrepresented his intentions.   Levitt, instead of acting as a non-exclusive distributor, had decided to begin manufacturing and selling his own batteries, using Kauffman's SPEEDCELL mark.

109.    Indeed, on information and belief, Levitt began selling his own products in combination with original SPEEDCELL batteries obtained from Counterclaimants.   In other words, if a customer ordered ten SPEEDCELL batteries, Levitt would order, for example, 5 from Counterclaimants and include 5 of his counterfeit batteries to complete the order.

110.    Levitt's Full Spectrum Power was apparently now building and selling his own battery system under the "SPEEDCELL" name.

111.   Unfortunately for Levitt, purchasing random parts and assembling battery systems to look like Kauffman's SPEEDCELL batteries (indeed using Kauffman's packaging and logo) did not solve the internal technical problems initially faced and solved by Kauffman through substantial laboratory and street testing (e.g. high amperage delivery and cell interconnects).

112.   It is evident from Levitt's copying of Kauffman's battery design that Levitt's counterfeit systems have not factored in the engineering test results perfected by Kauffman.

113.   Placing such counterfeit (and in fact dangerous) battery systems in the marketplace *using Kauffman's SPEEDCELL mark and logo*, serves only to damage the Counterclaimants' reputation in the industry.

114.   Kauffman and others believe that the infringing batteries used by Levitt are inferior to Kauffman's SPEEDCELL products because among other things: Levitt has used inferior grade cells, the methods of manufacture cover the OPD valve eliminating a key safety feature of the cells, and use of the inferior grade cells in combination with a 10 gauge wire braid generates unacceptable excess heat.

115.   Kauffman has received customer inquiries about Levitt's infringing line of batteries, and the market is confused about the source of the infringing material sold by Levitt under Kauffman's SPEEDCELL mark.

116.   Kauffman is concerned about the performance of the Levitt batteries that he and others reasonably believe are inferior, as they will negatively affect Kauffman and his SPEEDCELL business.

117.   Kauffman later learned that on October 22, 2009, one day after his last order of SPEEDCELL batteries from Kauffman, Levitt filed a trademark application for the "SPEEDCELL" trademark.  When Kauffman found out, he was furious and contacted Levitt.

Levitt response was simply (and inaccurately) "simple, I am the only one selling them." Kauffman then told Levitt that he would be in touch with his counsel, and Levitt hung up.

118.    Incredibly, Levitt then proceeded to contact the same vendors that Kauffman uses for raw materials in an effort to perfectly counterfeit the SPEEDCELL battery systems.

119.    Levitt then started to use the phrase "Lightweight Battery Solutions" to copy and trade off of Kauffman's "Lightweight Energy Solutions" trademark.

120.    Levitt's use of "SPEEDCELL" and "Lightweight Battery Solutions" is causing confusion in the marketplace and damaging Counterclaimants' reputation in the industry.

121.    Levitt's interference with Counterclaimants' vendors, dealers, and distributors has also caused damage to Counterclaimants' business and reputation in the industry.

122.    Upon information and belief, Levitt has just recently entered into an arrangement with Orient Express, Inc. for the unauthorized distribution of counterfeit batteries using the SPEEDCELL mark.

123.    Levitt has no authority to use and damage the SPEEDCELL name and goodwill by entering into an arrangement with Orient Express in the SPEEDCELL name.

124.    Shortly before the filing of this Counterclaim, Defendants learned that, without Defendants' knowledge and permission, Levitt registered to following domain names:

- www.speedcelltechnologies.com

- www.speedcelltechnologies.us

- www.speedcelltechnologies.org

- www.speedcelltechnologies.net,

- www.speedcelltechnologies.biz

- www.speedcelltechnologies.info

125.   Upon information and belief, Levitt has now also registered the following domain names:

- www.speed-cell.net

- www.speed-cell.org

- www.speed-cell.biz

- www.speed-cell.info

126.   At the time Levitt registered the domain names listed in the preceding paragraphs, Levitt knew that Defendants had used "SPEEDCELL" and "SPEEDCELL TECHNOLOGIES" in the marketplace.

127.   At the time Levitt registered the domain names listed in the preceding paragraphs, Levitt knew that Levitt had not developed "SPEEDCELL" and "SPEEDCELL TECHNOLOGIES."

128.   At the time Levitt registered the domain names listed in the preceding paragraphs, Levitt knew that Kauffman had developed "SPEEDCELL" and "SPEEDCELL TECHNOLOGIES."

129.   Levitt registered the domain names in the preceding paragraphs in an effort to prevent Defendants from using those domain names in commerce.

130.   Levitt registered the domain names in the preceding paragraphs in an effort to compete against Defendants in commerce.

131.   Levitt's actions have caused Counterclaimants to postpone the release of the second generation SPEEDCELL battery for fear that Plaintiffs will attempt to steal and counterfeit that battery technology as well.

132.   Indeed, the filing of Levitt's lawsuit is a further effort to usurp the SPEEDCELL business that Kauffman has worked so many years to develop.

**Count I**
**(Breach of Distribution Agreement)**

133.   Counterclaimants reallege and incorporate each and every allegation set forth above as if fully set forth and restated herein.

134.   Kauffman is the sole owner of the rights to the SPEEDCELL, SPEEDCELL TECHNOLOGIES, SPEEDCELL S logo, and Lightweight Energy Solutions marks ("the SPEEDCELL Marks").

135.   Kauffman has been continuously selling batteries under the SPEEDCELL Marks since at least as early as August 2008.

136.   As of early 2009, the parties agreed that Levitt would serve a non-exclusive distributor to purchase Counterclaimants' SPEEDCELL products for resale on the East Coast (the "Agreement").

137.   Initially, both parties performed the Agreement.

138.   Plaintiffs breached the Agreement by failing to pay for SPEEDCELL batteries delivered by Defendants.

139.   Plaintiffs breached the Agreement by manufacturing and selling its own batteries under the SPEEDCELL name as opposed to the distribution arrangement between the parties.

140.   Plaintiffs breached the Agreement by use the SPEEDCELL Marks in advertising of other products, and associating Counterclaimants' SPEEDCELL products with other products, including those products sold by Plaintiffs under the PULSE name.

141.   Plaintiffs breached the Agreement by holding themselves out as the owners of the SPEEDCELL Marks and products.

142.    Plaintiffs breached the Agreement by improperly selling, and continuing to sell products not manufactured by Counterclaimants under the SPEEDCELL Marks or attempting to associate those products with the SPEEDCELL Marks.

143.    Plaintiffs breached the Agreement by undercutting the pricing of other dealer/distributors when attempting to sell more of Counterclaimants' SPEEDCELL products.

144.    Plaintiffs breached the Agreement by improperly and fraudulently registering or attempting to register Counterclaimants' intellectual property, including the SPEEDCELL S mark and logo with the USPTO.

145.    Plaintiffs have conducted themselves in business in contravention to the way any commercially reasonable distributor would.

146.    Levitt has falsely and intentionally represented to the market that Levitt is either authorized to sell SPEEDCELL batteries, that Levitt is the owner of the SPEEDCELL Marks and/or that Levitt's batteries are of the same quality as those batteries developed and manufactured by Counterclaimants.

147.    Levitt has further begun use of a confusingly similar logo in connection with Full Spectrum Power that is designed to look similar in characteristic to Counterclaimants' SPEEDCELL S logo.  This use is often in connection with the use of the SPEEDCELL name thus improperly associating Full Spectrum Power and the confusingly similar logo with Counterclaimants' business

148.    All of these actions, separately and as a whole, are a breach of the distribution agreement and have caused Counterclaimants significant monetary damages, as well as damage to Counterclaimants' goodwill in the SPEEDCELL Marks and business reputation.

149.    Plaintiffs' breach of the Agreement has caused and will continue to cause harm to Counterclaimants, and is likely to continue unabated, thereby causing further damage and

irreparable harm to Counterclaimants and to the valuable goodwill symbolized by and associated with its distinctive and valuable SPEEDCELL Marks, unless enjoined and restrained by the Court.

150. Counterclaimants have no adequate remedy at law for damage to its reputation and will suffer irreparable injury if Plaintiffs are allowed to continue to wrongfully use Counterclaimants' SPEEDCELL Marks and/or any confusingly similar variations thereof.

## **Count II**
### **(False Designation of Origin and Unfair Competition Under Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)))**

151. Counterclaimants reallege and incorporate each and every allegation set forth above as if fully set forth and restated herein.

152. Kauffman is the sole owner of the rights to the SPEEDCELL Marks.

153. Kauffman has been continuously selling batteries under the SPEEDCELL Marks since at least as early as August 2008.

154. According to Plaintiffs' Complaint, Levitt has been selling batteries under the SPEEDCELL Marks since January 1, 2009.

155. Levitt's batteries are imitation products that do not meet the safety and quality specifications of Kauffman.

156. Levitt has falsely and intentionally represented to the market that Levitt is either authorized to sell SPEEDCELL batteries, that Levitt is the owner of the SPEEDCELL Marks and/or that Levitt's batteries are of the same quality as those batteries developed and manufactured by Counterclaimants.

157. Levitt has further begun use of a confusingly similar logo in connection with Full Spectrum Power that is designed to look similar in characteristic to Counterclaimants' SPEEDCELL S logo. This use is often in connection with the use of the SPEEDCELL name

thus improperly associating Full Spectrum Power and the confusingly similar logo with Counterclaimants' business.

158.    On information and belief, Plaintiff improperly authorizes Plaintiffs' business partners to use Counterclaimants' SPEEDCELL Marks in connection with the unauthorized sale of batteries, including, but not limited to Plaintiffs' batteries sold under the PULSE name.

159.    Plaintiffs' unlicensed, unconsented to, and otherwise unauthorized use of Counterclaimants' SPEEDCELL Marks, and/or confusingly similar variations thereof, on or in connection with their advertising, marketing, and promotion of their services and/or goods, constitutes a false designation of origin that wrongly suggests to the relevant purchasing public and consumers that such services and/or goods emanate from, or are licensed, endorsed, approved, or sponsored by, or are in some other way associated or connected with the Counterclaimants and/or their SPEEDCELL Marks.

160.    Plaintiffs' unlicensed, unconsented to, and otherwise unauthorized use of Counterclaimants' SPEEDCELL Marks and/or confusingly similar variations thereof, on and in connection with their advertising, marketing, and promotion of their services and/or goods, constitutes a false description or representation tending to suggest to the relevant purchasing public that the Counterclaimants are the source of origin of such services and/or goods.

161.    Plaintiffs' unlicensed, unconsented to, and otherwise unauthorized use of Counterclaimants' SPEEDCELL marks and/or confusingly similar variations thereof, has caused and/or is likely to continue to cause the trade, consumers, and the relevant  purchasing public to be confused and mistaken as to the source of origin of the services and/or goods being offered and provided by Counterclaimants and, further, to deceive the trade, consumers, and the relevant purchasing public as to whether the Plaintiffs are affiliated with, connected with, associated with, and/or a sponsor of Counterclaimants' use of the distinctive, well-known

and valuable SPEEDCELL mark, logo, and/or confusingly similar variations thereof on or in connection with such services and/or goods.

162.    Plaintiffs have further improperly associated the SPEEDCELL Marks with Plaintiffs' batteries sold under the PULSE name and/or the Full Spectrum Power Logo. Plaintiffs use of the SPEEDCELL mark with the PULSE batteries is yet a further attempt to improperly associate Counterclaimants rights and goodwill in the SPEEDCELL Marks with Plaintiffs other products as well.  Without the association of the SPEEDCELL Marks, the PULSE products would have been far less successful.  Indeed, Plaintiffs adoption of the PULSE name, but using the SPEEDCELL Marks is an intentional effort to trade off Counterclaimants' goodwill, then switch over to the PULSE mark once it is determined that Counterclaimants are the rightful owner of the SPEEDCELL Marks.

163.    By virtue of Plaintiffs' acts hereinabove described, Plaintiffs have committed, and are continuing to commit, acts of unfair competition and false designation of origin in violation of, inter alia, Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

164.    Plaintiffs' aforesaid acts of unfair competition and false designation of origin have caused and will continue to cause damage and irreparable harm to Counterclaimants, and are likely to continue unabated, thereby causing further damage and irreparable harm to Counterclaimants and to the valuable goodwill symbolized by and associated with its distinctive and valuable SPEEDCELL marks, unless enjoined and restrained by the Court.

165.    Counterclaimants have no adequate remedy at law and will suffer irreparable injury if Plaintiffs are allowed to continue to wrongfully use Counterclaimants' SPEEDCELL mark, logo, and/or any confusingly similar variations thereof.

### Count III
### (Trademark Infringement Under Section 32 of the Lanham Act
### (15 U.S.C. §1114(1)))

166.    Counterclaimants reallege and incorporate each and every allegation set forth above as if fully set forth and restated herein.

167.    Counterclaimant Kauffman is the current owner of all right, title, and interest in and to the SPEEDCELL mark, logo, trade name, and all goodwill appurtenant thereto.

168.    Plaintiffs have advertised, marketed, provided, promoted, and/or sold goods using Counterclaimants' distinctive, well-known and valuable SPEEDCELL marks and/or confusingly similar variations thereof, without license, consent, or other authorization from Counterclaimants.

169.    Plaintiffs have never requested or otherwise sought Counterclaimants' consent, authorization, or a license, to use Counterclaimants SPEEDCELL marks, and/or any confusingly similar variations thereof for Plaintiffs' own products.

170.    Counterclaimants never licensed, consented to, or otherwise authorized Plaintiffs to use their distinctive, valuable and well-known SPEEDCELL Marks, and/or confusingly similar variations thereof for Plaintiffs' own products.

171.    Without license, consent, or other authorization, Plaintiffs adopted, began using, marketing, advertising, promoting, and selling their goods using Counterclaimants' distinctive, valuable and well-known SPEEDCELL Marks, and/or confusingly similar variations thereof for Plaintiffs' own purposes.  The goods that Plaintiffs are marketing, advertising, promoting, and selling under or in connection with Counterclaimants' distinctive, valuable and well-known SPEEDCELL Marks, and/or confusingly similar variations thereof, are marketed, advertised, and promoted to, and available in, the same channels of commerce and trade as the goods marketed, advertised, promoted, and provided by Counterclaimants.

172.   The goods marketed, advertised, promoted, and sold by Plaintiffs are the same as, similar to, and/or competitive with, the goods marketed, advertised, promoted, and sold by Counterclaimants under and/or in connection with their valuable SPEEDCELL Marks.

173.   Upon information and belief, Plaintiffs adopted, used, and continue to use Counterclaimants' distinctive, valuable and well-known SPEEDCELL Marks in an unlicensed, unconsented to, and otherwise unauthorized manner for the purpose of benefiting from and trading upon the goodwill enjoyed by Counterclaimants from their SPEEDCELL Marks. Plaintiffs have done so in bad faith.

174.   Plaintiffs' actions and wrongful use of SPEEDCELL Marks and/or confusingly similar variations thereof, has caused and will continue to cause the trade, consumers, and the relevant purchasing public to be confused and to erroneously believe that Plaintiffs are either licensed by Counterclaimants to use the SPEEDCELL Marks and/or that Counterclaimants and/or their respective goods are otherwise associated with the SPEEDCELL Marks. Counterclaimants' valuable business reputations are being damaged by, and the distinctive character and quality associated with Counterclaimants' SPEEDCELL Marks are being irreparably harmed by, Plaintiffs' conduct.

175.   Upon information and belief, Plaintiffs' actions have been committed with knowledge and intent to cause confusion, mistake, or deception.

176.   Plaintiffs' actions constitute trademark infringement in violation of, inter alia, Section 32 of the Lanham Act, 15 U.S.C. § 1114(1).

177.   The aforesaid acts of trademark infringement have caused and will continue to cause damage and irreparable harm to Counterclaimants and are likely to continue unabated, causing further damage and irreparable harm to Plaintiff and the goodwill symbolized by and associated with its SPEEDCELL Marks, unless enjoined and restrained by this Court.

178.    Counterclaimants have no adequate remedy at law.

**Count IV**
**(Trademark Dilution Under Section 43(C) of the Lanham Act (15 U.S.C. § 1125(C)))**

179.    Counterclaimants reallege and incorporate each and every allegation set forth above as if fully set forth and restated herein.

180.    Plaintiffs allege in their Complaint that the SPEEDCELL mark is distinctive famous.   To the extent this legal conclusion is accurate, it is so as a result of the Counterclaimants' use and advertisement of the SPEEDCELL Marks on and in connection with advertising, marketing, promotion, offers for sale, and sale of motorcycle batteries, and the strong recognition and reputation of Counterclaimants' mark and logo among the trade, consumers and the relevant purchasing public, the SPEEDCELL Marks.

181.    Plaintiffs' adoption, registration and use of the SPEEDCELL Marks on their products has diluted, and is continuing to dilute, the distinctive quality of the SPEEDCELL Marks by lessening the ability and capacity of the mark to identify and distinguish Counterclaimants as the sole source of origin of their batteries.

182.    Plaintiffs' adoption, registration and use of the www.speed-cell.com, www.speedcelltechnologies.com, www.speedcelltechnologies.us, www.speedcelltechnologies.org, www.speedcelltechnologies.net, www.speedcelltechnologies.biz, www.speedcelltechnologies.info, and apparent adoption, registration, and use of  www.speed-cell.net, www.speed-cell.org, www.speed-cell.biz, and www.speed-cell.info domain names has and is continuing to dilute the distinctive quality of the SPEEDCELL Marks by lessening the extensive and valuable goodwill, quality, and honor that is associated with it.

183.    By virtue of Plaintiffs' acts hereinabove described, Plaintiffs have violated and continue to violate the provisions of, inter alia, the Federal Trademark Dilution Act, 15 U.S.C. §1125(c).

184.    Plaintiffs' acts of dilution have caused and will continue to cause damage to Counterclaimants and to the goodwill symbolized by and associated with its distinctive, valuable, and well-known SPEEDCELL Marks in an amount that cannot be ascertained at this time.

185.    Plaintiffs' acts have caused and will continue to cause great and irreparable harm to Counterclaimants and their SPEEDCELL Marks and, unless enjoined by this Court, will cause further substantial, immediate, and irreparable injury to Counterclaimants.

186.    Counterclaimants have no adequate remedy at law and are entitled to injunctive relief against Plaintiffs restraining further acts of trade dilution by Plaintiffs, and damages.

### Count V
### (Cybersquatting Under Section 43(d) of the Lanham Act (15 U.S.C. § 1125(d)))

187.    Counterclaimants reallege and incorporate each and every allegation set forth above as if fully set forth and restated herein.

188.    Plaintiffs' adoption, registration, and use of the www.speed-cell.com, www.speedcelltechnologies.com, www.speedcelltechnologies.us, www.speedcelltechnologies.org, www.speedcelltechnologies.net, www.speedcelltechnologies.biz, www.speedcelltechnologies.info, and apparent adoption, registration, and use of  www.speed-cell.net, www.speed-cell.org, www.speed-cell.biz, and www.speed-cell.info domain names violates the U.S. Anti-Cybersquatting Consumer Protection Act, Section 43(d) of the Lanham Act, 15 U.S.C. § 1125(d).

189. Kauffman registered the www.speedcell.us and www.speedcell.org. domain names in 2008.

190. As described above, as a result of the Counterclaimants' use, advertisement, and sale of the SPEEDCELL product, the SPEEDCELL name is distinctive and famous.

191. The domain names www.speed-cell.com, www.speedcelltechnologies.com, www.speedcelltechnologies.us, www.speedcelltechnologies.org, www.speedcelltechnologies.net, www.speedcelltechnologies.biz, www.speedcelltechnologies.info, www.speed-cell.net, www.speed-cell.org, www.speed-cell.biz, and www.speed-cell.info are virtually identical and confusingly similar to Counterclaimants' distinctive SPEEDCELL Marks.

192. Plaintiffs' adoption, registration, and use of the www.speed-cell.com, www.speedcelltechnologies.com, www.speedcelltechnologies.us, www.speedcelltechnologies.org, www.speedcelltechnologies.net, www.speedcelltechnologies.biz, www.speedcelltechnologies.info, and apparent adoption, registration, and use of www.speed-cell.net, www.speed-cell.org, www.speed-cell.biz, and www.speed-cell.info domain names is dilutive of Counterclaimants SPEEDCELL Marks, harms the goodwill of Counterclaimants' mark, and tarnishes and disparages the mark.

193. Plaintiffs' acts of cybersquatting have caused damage and threaten to cause further damage to the Counterclaimants and their mark and logo in an amount that cannot be ascertained at this time.

194. Plaintiffs' acts have caused and will continue to cause great and irreparable harm to the Counterclaimants and their mark and logo and, unless enjoined by this Court, will cause further substantial, immediate and irreparable injury to Counterclaimants.

195. Counterclaimants have no adequate remedy at law.

196.    By reason of the foregoing, Counterclaimants are entitled to Plaintiffs' forfeiture or cancellation of the www.speed-cell.com, www.speedcelltechnologies.com, www.speedcelltechnologies.us, www.speedcelltechnologies.org, www.speedcelltechnologies.net, www.speedcelltechnologies.biz, www.speedcelltechnologies.info, and apparent adoption, registration, and use of www.speed-cell.net, www.speed-cell.org, www.speed-cell.biz, and www.speed-cell.info domain names or the transfer of the domain names to Counterclaimants, injunctive relief against Plaintiffs restraining further acts of cybersquatting by Plaintiffs, and damages.

### Count VI
### (Statutory Mark Infringement under Virginia Law (Va. Code § 59.1-92.12))

197.    Counterclaimants reallege and incorporate each and every allegation set forth above as if fully set forth and restated herein.

198.    Kauffman was the first to use the SPEEDCELL Marks in the course of selling and advertising motorcycle batteries in the Commonwealth of Virginia.  Levitt was nothing more than a non-exclusive distributor of Counterclaimants' products.

199.    Counterclaimants continue to use their SPEEDCELL Marks in the course of selling and advertising the SPEEDCELL line of motorcycle batteries within the Commonwealth.

200.    As described above, Plaintiffs have advertised, marketed, provided, promoted, and/or sold goods using Counterclaimants' distinctive, well-known, and valuable SPEEDCELL Marks, and/or confusingly similar variations thereof, without license, consent, or other authorization from Counterclaimants.

201.    As described above, Plaintiffs have never requested or otherwise sought Counterclaimants' consent, authorization, or a license, to use Counterclaimants' SPEEDCELL

Marks, and/or any confusingly similar variations thereof for Plaintiffs' own products, and Counterclaimants never licensed, consented to, or otherwise authorized Plaintiffs to use its distinctive, valuable and well-known SPEEDCELL Marks, and/or confusingly similar variations thereof for Plaintiffs' own products.

202.    The goods marketed, advertised, promoted, and sold by Plaintiffs are the same as, similar to, and/or competitive with, the goods marketed, advertised, promoted, and sold by Counterclaimants under and/or in connection with their valuable SPEEDCELL Marks.

203.    Upon information and belief, Plaintiffs adopted, used, and continue to use Counterclaimants' distinctive, valuable and well-known SPEEDCELL Marks in an unlicensed, unconsented to, and otherwise unauthorized manner for the purpose of benefiting from and trading upon the goodwill enjoyed by Counterclaimants from their SPEEDCELL Marks.

204.    Plaintiffs' actions and wrongful use of SPEEDCELL and/or confusingly similar variations thereof, has caused and will continue to cause the trade, consumers, and the relevant purchasing public to be confused, mistaken, or deceived and to erroneously believe that Plaintiffs are either licensed by Counterclaimants to use SPEEDCELL and/or that Plaintiffs and/or their respective goods are otherwise associated with SPEEDCELL.

205.    Counterclaimants' valuable business reputations are being damaged by, and the distinctive character and quality associated with Counterclaimants' SPEEDCELL mark are being irreparably harmed by, Plaintiffs' conduct.

206.    Upon information and belief, Plaintiffs' actions have been committed with knowledge and intent to cause confusion, mistake, or deception.

207.    Plaintiffs' actions constitute trademark infringement in violation of, inter alia, of Virginia Code § 59.1-92.12.

208.     The aforesaid acts of trademark infringement have caused and will continue to cause damage and irreparable harm to Counterclaimants and are likely to continue unabated, causing further damage and irreparable harm to Counterclaimants and the goodwill symbolized by and associated with its SPEEDCELL Marks, unless enjoined and restrained by this Court.

### Count VII
### (Intentional Interference)

209.     Counterclaimants reallege and incorporate each and every allegation set forth above as if fully set forth and restated herein.

210.     As described above, Counterclaimants have been and are currently selling batteries to the motorcycle racing industry, starting at least as early as August 2008.

211.     Upon knowledge and belief, Plaintiffs were aware that Counterclaimants were selling batteries to the motorcycle racing industry and would continue to do so.

212.     Upon information and belief, Plaintiffs intentionally sought to gain from Counterclaimants' goodwill, trademarks, products, and business reputation by asserting that Plaintiffs, not Counterclaimants, were the owners of the SPEEDCELL mark and products.

213.     Plaintiffs have contacted Counterclaimants' long-time customers, distributors, and others in the industry that Plaintiffs have actual or prospective relationships with misrepresenting Plaintiffs' role in the SPEEDCELL products.

214.     Upon information and belief, Counterclaimants' clients and customers have, in certain instances elected to purchase products from Plaintiffs because they wrongly believed that Plaintiffs were the source of the goodwill and high quality products sold by Counterclaimants under the SPEEDCELL mark..

215. Upon information and belief, Counterclaimants have lost sales that would have occurred but for the actions of Counterclaimants, including sales of Plaintiffs' PULSE batteries. Plaintiffs' actions, as described above were, intended to damage both Counterclaimants in the sale of SPEEDCELL batteries and other products to the motorcycle racing industry.

216. Counterclaimants are entitled to recover damages from Plaintiffs in an amount to be proven at trial.

## Count VIII
### (Common Law Mark Infringement)

217. Counterclaimants reallege and incorporate each and every allegation set forth above as if fully set forth and restated herein.

218. Counterclaimants have prior and exclusive rights to the use of the SPEEDCELL Marks to identify, market, promote, and sell their motorcycle batteries.

219. Plaintiffs have used, and continue to use, Counterclaimants' SPEEDCELL Marks, and/or confusingly similar variations thereof in connection with the advertising and selling of motorcycle batteries (including Plaintiffs' PULSE batteries) in such a manner as to create a likelihood of confusion among prospective purchasers, thereby leading purchasers and others to believe, contrary to fact, that the goods and services sold by Plaintiffs are rendered, sponsored, or otherwise approved by, or created in connection with Counterclaimants, which acts of Plaintiffs have damaged, impaired and diluted that part of Counterclaimants' goodwill symbolized by the SPEEDCELL Marks, causing immediate and irreparable damage to Counterclaimants.

220. The nature, probable tendency and effect of Plaintiffs' use of Counterclaimants' SPEEDCELL Marks, and/or confusingly similar variations thereof, in the manner alleged is to

enable Plaintiffs to deceive the public by passing off its goods and services a being rendered, sponsored, or otherwise approved by or connected with Counterclaimants.

221.   Plaintiffs' use of Counterclaimants' SPEEDCELL Marks, and/or confusingly similar variations thereof, in connection with the advertising and selling of electronic advertising services, is likely to cause confusion, mistake, or deception as to the source or origin of Plaintiffs' goods or services and constitutes infringement of Counterclaimants' SPEEDCELL Marks under the common law of the Commonwealth of Virginia.

222.   Plaintiffs' use of Counterclaimants' SPEEDCELL Marks, and/or confusingly similar variations thereof, has caused and/or is likely to continue to cause the trade, consumers, and the relevant purchasing public to be confused and mistaken as to the source of origin of the services and/or goods being offered and provided by Plaintiffs and, further, to deceive the trade, consumers, and the relevant purchasing public as to whether the Counterclaimants are affiliated with, connected with, associated with, and/or sponsors of Plaintiffs' use of the distinctive, well-known and valuable SPEEDCELL Marks, and/or confusingly similar variations thereof on or in connection with such services and/or goods.

223.   Plaintiffs' acts have caused and will continue to cause great and irreparable harm to Counterclaimants and their SPEEDCELL Marks and, unless enjoined by this Court, will cause further substantial, immediate, and irreparable injury to Counterclaimants.

224.   Counterclaimants have no adequate remedy at law and are entitled to injunctive relief against Plaintiffs restraining further acts of infringement by Plaintiffs, and damages.

## Count IX
### (Common Law Unfair Competition)

225.   Counterclaimants reallege and incorporate each and every allegation set forth above as if fully set forth and restated herein.

226.    Plaintiffs have used, and continue to use, the SPEEDCELL Marks without permission or authority.

227.    Upon information and belief, Plaintiffs have sold, and continue to sell, products displaying the SPEEDCELL Marks into the Commonwealth of Virginia.

228.    Plaintiffs' unauthorized use, adoption, appropriation, and/or copying of the SPEEDCELL Marks constitutes unfair competition in violation of the common law of the Commonwealth of Virginia.

229.    Plaintiffs' actions have damaged Counterclaimants and their business.

230.    Counterclaimants are entitled to recover damages from Plaintiffs in an amount to be proved at trial.

231.    Unless temporarily, preliminarily, and permanently enjoined, Plaintiffs will continue to cause irreparable harm for which there exists no adequate remedy at law.

## Count X
### (Declaratory Judgment)

232.    Counterclaimants reallege and incorporate each and every allegation set forth above as if fully set forth and restated herein.

233.    There exists between the parties an actual controversy within the Court's jurisdiction.

234.    Under 28 U.S.C. §2201 and Fed. R. Civ. P. 57, the Court may declare the rights and leave relations between the parties.

235.    Among other things, Counterclaimants seek a declaration concerning their rights under the Agreement and their rights to the SPEEDCELL Marks.

236.    Counterclaimants also seek a declaration that Plaintiffs must cease and desist from use of the current Full Spectrum Power logo, as well as any logo that is confusingly similar to Defendants' SPEEDCELL logo.

### Count XI
### (Unjust Enrichment)

237.    Counterclaimants reallege and incorporate each and every allegation set forth above as if fully set forth and restated herein.

238.    Plaintiffs sought and received from Defendants certain products.

239.    Plaintiffs obtained the benefit of those products.

240.    Plaintiffs have been unjustly enriched to Defendants' detriment, and therefore Defendants are entitled to an award in the amount to be determined at trial.


WHEREFORE, Joshua Kauffman and Navitus Group, LLC pray:

1.    That the Court enter judgment enter on their behalf against Counterclaimants on all counts of the Counterclaim;

2.    That the Court preliminarily and permanently enjoin Plaintiffs and/or their respective employees, partners, officers, directors, agents, representatives, attorneys, successors, and assigns, and all persons in active concert or participation with any of them, from doing business as SPEEDCELL, and/or from otherwise using the SPEEDCELL Marks, and/or any confusingly similar variations thereof, in any manner or form, or any other reproduction, counterfeit, copy, or colorable imitation of such mark, either alone or in combination with any other designation, and from otherwise competing unfairly with Counterclaimants;

3.      That the Court order Plaintiffs to dismantle, take down, or otherwise cease operation of any website having the domain names www.speed-cell.com and/or any similar variations thereof, including but not limited to www.speedcelltechnologies.com, www.speedcelltechnologies.us, www.speedcelltechnologies.org, www.speedcelltechnologies.net, www.speedcelltechnologies.biz, www.speedcelltechnologies.info, www.speed-cell.net, www.speed-cell.org, www.speed-cell.biz, and www.speed-cell.info;

4.      That the Court order Plaintiffs to immediately transfer the domain names www.speed-cell.com, and/or any similar variations thereof, to Counterclaimants;

5.      That the Court order Plaintiffs to take down, remove, destroy and/or obliterate any and all, labels, signs, brochures, advertisements and other items in its possession, or under its control, upon which appear or reflect the SPEEDCELL Marks, and/or any confusingly similar variations thereof, in any manner or form, or any other reproduction, counterfeit, copy, or colorable imitation of the SPEEDCELL Marks, either alone or in combination with any designation;

6.      That the Court preliminarily and permanently enjoin Plaintiffs and/or their respective employees, partners, officers, directors, agents, representatives, attorneys, successors, and assigns, and all persons in active concert or participation with any of them, from using the current Full Spectrum logo, and/or any similar variations thereof, in any manner or form, either alone or in combination with any other designation, and from otherwise competing unfairly with Counterclaimants because such logos are confusingly similar to the Counterclaimants' SPEEDCELL logo;

7.      That the Court order Plaintiffs to pay to Counterclaimants compensatory damages in an amount to be determined at trial;

8.     That the Court order Plaintiffs to account for and pay to Counterclaimants all profits realized by Plaintiffs from their infringement of or upon Counterclaimants' SPEEDCELL Marks, their false designations of origin, their false and misleading advertising and promotion, their misrepresentations, and their acts of unfair competition;

9.     That the Court declare that Counterclaimants are the sole rightful owners and users of the SPEEDCELL Marks;

10.    That the Court declare that Plaintiffs must cease and desist from use of the current Full Spectrum Power logo, as well as any logo that is confusingly similar to Defendants' SPEEDCELL logo;

11.    That the Court order Plaintiffs to place conspicuous statements or advertisements sufficient to rectify remaining customer confusion relating to the SPEEDCELL Marks and that Full  Spectrum Power and Levitt are in no way associated with Counterclaimants or the SPEEDCELL Marks;

12.    That the Court order Plaintiffs to pay Counterclaimants their costs and expenses incurred in and related to this action;

13.    That the Court order Plaintiffs to pay Counterclaimants' attorneys' fees;

14.    That the Court award Counterclaimants exemplary damages in the full amount permitted by law; and

15.    That the Court award such other and further relief as the Court deems just and proper under the circumstances.


Dated:  May 10, 2010                    JOSHUA KAUFFMAN, and NAVITUS LLC

                                        By counsel

/s/_____
Attison L. Barnes, III (VA Bar No. 30458)
WILEY REIN LLP
1776 K Street, N.W.
Washington, DC  20006
Telephone:  (202) 719-7000
Fax: (202) 719-7049
abarnes@wileyrein.com
*Counsel for Defendants/Counterclaimants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 10th day of May, 2010, I will electronically file the foregoing

with the Clerk of Court using the CM/ECF system, which will send a notification of such Filing

(NEF) to the following:

> Jennifer M. Kies, Esq.
> Alec W. Farr, Esq.
> BRYAN CAVE LLP
> 1155 F Street, NW
> Suite 700
> Washington, DC  20004
> Phone: (202) 508-6044
> Facsimile: (202) 508-6200
> jennifer.kies@bryancave.com
> awfarr@bryancave.com

> /s/_____
> Attison L. Barnes, III (VA Bar No. 30458)
> WILEY REIN LLP
> 1776 K Street, N.W.
> Washington, DC  20006
> Telephone:  (202) 719-7000
> Fax: (202) 719-7049
> abarnes@wileyrein.com
> *Counsel for Defendants/Counterclaimants*